# FORD,
*Petitioner,*

*v.*

# SAIF CORPORATION,
*Respondent.*

(82-09898; CA A31286)

693 P2d 1339

Charles S. Tauman, Portland, argued the cause for petitioner. With him on the brief were Dennis O'Malley and Willner, Bennett, Hartman & Tauman, P.C., Portland.

Donna Parton Garaventa, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Before Richardson, Presiding Judge, and Warden and Newman, Judges.

NEWMAN, J.

## NEWMAN, J.

Claimant seeks review of an order of the Workers' Compensation Board that affirmed the referee's denial of compensability of his occupational disease claim for hearing loss due to prolonged exposure to noise. We reverse.

Beginning in 1954, claimant worked for 28 years for Forest Fiber Products Company at its hardboard (or "masonite") manufacturing plant. He worked for approximately the first 16 years in the treatment department and the remaining years as a maintenance employe. He filed his claim when he retired in 1982 at the age of 61. The treatment department trimmed hardboard with saws and coated, baked and rehumidified it. The saws, motors and fans made a constant loud noise. Brushes, which made a constant loud, high-pitched noise, then buffed the board. Claimant stood next to the buffing machine for the better part of every working day for 16 years. As a maintenance employe, beginning in 1970, claimant worked throughout the mill, including the trimming area, which was in an open floor containing saws, sanders and planers. Initially the machinery was unenclosed and made "screaming" noises. Claimant "set up" the equipment daily and adjusted it for thickness variations.

Commencing in the early 1970's, the employer provided earplugs and earmuffs. Claimant often did not use them, because he needed to hear the machinery to determine if it was running properly. In the early 1970's employer also began to box in some of the major machinery with noise enclosures. It completed that program in approximately 1979. Employer sought to meet Occupational Safety and Health Administration standards of an eight-hour time-weighted average noise exposure of under 90 decibels. By 1982, all but one work station at the plant met those standards, which allow excess noise providing the average is maintained. The employer continued to require earplugs and noise mufflers in a number of plant areas.

Claimant first noticed his loss of hearing after the mid-1960's. He had had no hearing problems when he began working at the plant in 1954. His wife testified that she noticed 10 to 15 years ago that claimant had difficulty hearing

her speak and that his hearing difficulty was particularly evident if there was more than one source of sound. Claimant did not miss any work as a result of his hearing difficulty.

On January 6, 1976, claimant first consulted Dr. Hodgson concerning the hearing loss. On September 7, 1982, the doctor wrote to insurer:

"I first saw Mr. Ford on January 6, 1976. He stated that his hearing had been decreasing for the past eight to ten years. He had no past history of ear infections but stated that he worked around a moderate amount of noise. He had been on no medication and had had no ringing in his ears. At that time, he was fifty-four and was wondering why his hearing was decreasing and wanted it evaluated. I did not go into the exposure to noise other than his work since there was not a question of litigation at that time.

"The ear, nose and throat examination was completely normal. The audiometric examination showed a moderately higher frequency sensory neuro hearing loss in both ears of about equal degrees reaching eighty decibels at two thousand cycles and improving a little in the higher frequencies.

"I told Mr. Ford that I thought he had a hearing loss in the inner ear, most likely due to noise exposure since he had worked around a moderate amount of noise. I, again, did not go into any questioning of his noise exposure at home or any other place, but it would be impossible to differentiate between noise exposure at work and that in his home or recreational areas if there is no sound level testing.

"I tested Mr. Ford again on April 10, 1979, and his hearing had stayed about the same on that test. His symptoms had changed not at all during the period. He was tested again on October 21, 1980, and again, his hearing had not changed significantly.

"I last tested him on October 27, 1981, and his hearing had decreased somewhat in the one thousand cycle range from thirty to thirty-five decibels. Also there was a slight increase at two thousand cycles, but I do not feel that this was particularly significant.

"In answer to your questions, the most likely cause for Mr. Ford's hearing loss is due to noise exposure. It is impossible to differentiate between that obtained at work and that obtained elsewhere. His curve is very typical of a person in noise exposure. Without the background noise level readings using octave ban analyzers and decibel meters, it would be impossible to tell whether he is exposed to hazardous noise which is

now considered to be ninety decibels for eight hours as a cause of his hearing loss. There is *[sic]* no pre-disposing factors that I can determine that would add to this impression.

"As to his treatment, his hearing is decreasing to the point where I feel that in the not-too-distant future, he may need to consider a hearing aid. I did advise him that he should be wearing noise protection when he is exposed to hazardous noise, either at work or in any other situation. Normally we run into hazardous noise in the home in the use of power saws and other power equipment. Some people also do a fair amount of shooting which is also a source of noise exposure. Again, I did not go into detail with Mr. Ford on this point."

Claimant consulted Dr. Korn in November 1976. He wrote that claimant "has worked in [a] noisy shop for years." He diagnosed a "noise-induced hearing loss." After claimant filed the claim, the Portland Center for Hearing and Speech tested him. Its September 20, 1982, report to insurer stated:

"Mr. Ford presented a mild to moderately severe sensorineural loss in the mid and high frequencies. The loss had a sloping and slightly notched configuration. This pattern would be consistent with a history of long-term exposure and presbycusis.[1]

"Mr. Ford's primary source of noise exposure appears to have been at Forest Fiber Products; however, it seems he also had significant exposure in his previous employment and the military. Unfortunately, as there was no pre-employment hearing test it is not possible to determine how much, if any, of the loss was pre-existent to his employment at Forest Fiber Products.

"The percentage of hearing impairment, calculated with a correction factor for presbycusis, was 18.74% right, 20.4% left, and 18.94% binaural."

The referee held that claimant's filing was untimely. ORS 656.807(1):[2]

---

[1] Presbycusis is a "loss of ability to perceive or discriminate sounds as a part of the aging process; the pattern and age of onset may vary." *Stedman's Medical Dictionary* (23rd ed 1976).

[2] ORS 656.807(1) provides:

"Except as otherwise limited for silicosis, asbestosis and asbestos-related diseases, all occupational disease claims shall be void unless a claim is filed with the insurer or self-insured employer within five years after the last exposure in employment subject to the Workers' Compensation Law and within 180 days from

> "By claimant's testimony, he sought medical services in 1976 because he felt his exposure to noise at work had caused a hearing loss. Dr. Hodgson confirmed claimant's suspicion about his hearing loss and, only knowing of claimant's exposure to noise from his work environment, told claimant it was most likely due to this noise. In the context in which it was given, this information was sufficient for claimant to know he was suffering from an occupational disease, even though the specific words may not have been used. Claimant had a duty to file his claim within 180 days, which he did not do. Had he done so, noise level tests could have been conducted to establish the degree of exposure. Eight years later, in 1982, it became impossible to acquire this information. Lack of this information was prejudicial to the employer's position. I find that claimant is barred from filing his claim at this late date."

The referee also ruled that claimant had not carried his burden of proof that the noise level at his work caused his hearing loss:

> "While Dr. Hodgson and the audiologist [Wendy Ainsworth, M.S., of the Portland Center for Hearing & Speech] relate claimant's hearing loss was most likely due to noise exposure, neither, without comparable noise level testing would attempt to differentiate between claimant's differing exposures. There is no medical opinion that causally relates claimant's hearing loss to his employment. Besides this apparent lack of required medical causation evidence, there is also no evidence that the noise level at claimant's place of employment exceeded the standard of 90 DBA level which is felt to be safe. Claimant has not carried his burden of proof."

The Board affirmed the referee without opinion.

■ Claimant assigns as error that the Board affirmed the referee's ruling that the claim was barred as untimely filed. Claimant argues that neither Dr. Korn nor Dr. Hodgson said directly that his hearing loss was the result of noise exposure at the plant. He testified, "They just wouldn't come right out and tell me what caused this." We agree with the referee that on January 6, 1976, Dr. Hodgson gave claimant sufficient information for him to know that he was suffering from an

the date the claimant becomes disabled or is informed by a physician that the claimant is suffering from an occupational disease whichever is later."

occupational disease. Claimant did not file within 180 days of that date. *See* ORS 656.807(1). On the other hand, we do not agree that the claim was barred, because the employer was not prejudiced by the delay.

██ ORS 656.265(4)(a) provides that failure to give notice as required by that section bars a claim unless, among other things, "the insurer or self-insured employer has not been prejudiced by failure to receive the notice." In *Inkley v. Forest Fiber Products Co.,* 288 Or 337, 347, 605 P2d 1175 (1980), the court held that ORS 656.265(4) is applicable to occupational diseases claims. *See also Hayes-Godt v. Scott Wetzel Services,* 71 Or App 175, 691 P2d 919 (1984).[3] The burden of proving prejudice is on the employer. *Inkley v. Forest Fiber Products Co., supra,* 288 Or at 348. That some time has passed and that the employer claims it has been prejudiced is not sufficient. *Raifsnider v. Caveman Industries, Inc.,* 55 Or App 780, 784, 639 P2d 1298 (1982). The referee found that the employer was prejudiced because, if an earlier notice had been given, "noise level tests could have been conducted to establish the degree of exposure. Eight years later, in 1982, it became impossible to acquire this information." Employer's safety coordinator, however, testified that noise level tests were taken at the plant between 1970 and 1982, but that he did not know where those records were. The employer failed to locate the test results and introduce them at the hearing. Insurer did not carry its burden of proof that the employer was prejudiced by the passage of time.

Petitioner also argues that the Board erred when it affirmed the referee's ruling that claimant did not carry his burden of proof that his hearing loss was causally related to his employment. Insurer responds that claimant has not established that his work exposure at the plant was the major contributing cause of his hearing loss, a point the referee did not discuss directly. Insurer asserts that there was no pre-employment hearing test to determine how much, if any, of claimant's hearing loss existed before 1954. Dr. Hodgson

---

[3] As in *Hayes-Godt v. Scott Wetzel Services, supra,* 71 Or App at 179 n 2, we do not accept the argument of insurer that the Supreme Court blindly relied on our earlier decision in *Gronquist v. SAIF,* 25 Or App 27, 547 P2d 1374, *rev den* (1976), and failed to consider the changes in the statute when it held in *Inkley v. Forest Fiber Products Co., supra,* that ORS 656.265(4) is applicable to occupational disease claims.

stated that he did not inquire into claimant's exposure to noise other than at his work and stated that "it would be impossible to differentiate between noise exposure at work and that in his home or recreational areas if there is no sound level testing."

■ ■ Certainty is not the required degree of proof for a claim under the Workers' Compensation Law. *See Hutcheson v. Weyerhaeuser,* 288 Or 51, 55, 602 P2d 268 (1979). The evidence shows that claimant suffered a hearing loss due to noise exposure, that he had no hearing problem when he started to work at the employer's plant in 1954 and that he did not begin to experience symptoms until the last half of the 1960's. During his many years of work at the plant, he was regularly exposed to high levels of noise. There is no evidence that he was exposed to abnormal noise off the job. The preponderance of evidence, therefore, shows a causal relationship between claimant's hearing loss and the workplace.

The evidence further establishes that the noise at the plant between 1954 and 1982 was the major contributing cause of claimant's hearing loss. Insurer questioned witnesses about the possible contributory effects of claimant's exposure to noise at home or while hunting, or before 1954 in the military or other employment. There is, however, no evidence that claimant was exposed to excessive noise at home or while hunting or that he suffered any loss of hearing because of noise exposure in the military or in prior employment. The evidence also shows that claimant had no hearing impairment when he began to work at the employer's plant in 1954 and only noticed a hearing loss over a decade later. Although there is evidence that the pattern of claimant's hearing loss is consistent with presbycusis, claimant's pattern of hearing loss is also consistent with his long-term exposure to noise at the employer's plant. We find that claimant proved that his exposure to noise at his employment was the major contributing cause of his hearing loss.

Reversed and remanded with instructions to accept the claim.